No. 13,686.

UNITED STATES FIDELITY AND GUARANTY COMPANY ET AL. *v.* INDUSTRIAL COMMISSION, ET AL.
(45 P. [2d] 895)

Decided May 13, 1935.

Mr. HENRY H. CLARK, Mr. W. FELDER COOK, for plaintiffs in error.

Mr. PAUL P. PROSSER, Attorney General, Mr. M. S. GINSBERG, Assistant, Mr. JACOB V. SCHAETZEL, Mr. MERRILL A. KNIGHT, for defendants in error.

*In Department.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE claimant, widow of Chris Yuenger, deceased, was awarded death benefits by the Industrial Commission, which award was sustained by the district court. The defendants, Colorado National Bank of Denver, as employer, and the United States Fidelity and Guaranty Company, as insurer, bring the case to this court on writ of error.

The assignments of error may be considered under two heads: First. That under chapter 177, Session Laws, 1931, section 1, the commission is without authority to set aside the findings of the referee unless its takes additional testimony or has a hearing de novo. Second.

That there is no evidence to sustain the findings and award to claimant.

At the conclusion of the testimony the referee made his summary order, as he is authorized to do under section 4470, C. L. 1921, denying any compensation. Subsequently the claimant filed a petition asking the commission to review the order of its referee as provided by chapter 177, Session Laws, 1931, section 1. On a review, the commission did not take or order the taking of additional testimony as chapter 177, supra, gives it discretion to do. It made its findings on the record alone, reversed the order of the referee denying compensation, and awarded compensation as a death benefit to the claimant, widow of deceased.

Respondents urge that in reversing the award of the referee without first exercising its discretion to take or ordering the taking of additional testimony, the commission exceeded its authority. They very succinctly state their contention, that if it be held that the findings of the commission are binding on the district court and on this court, that "we have the anomalous situation of the Commission's factual finding being conclusive on all the courts of the state when the Commission is not any differently apprised of the facts than are the courts, and certainly are less experienced in the matter of applying the law to the facts disclosed by the cold record." Respondents point out that section 4471, C. L. 1921, provides as follows. "Upon the filing of any such petition the commission shall review the entire record of proceedings in said cause and in its discretion may take or order the taking of additional testimony *and shall either affirm the findings and award of the referee or may enter a new finding and award, affirming or reversing the finding or award of the referee in whole or in part.*" That section of the statute as amended by chapter 177, Session Laws, 1931, provides for a petition to review the summary order of the referee and provides further that if the referee shall not amend or modify the order, he shall refer the

entire case to the commission and "the commission shall thereupon review the entire record in said case, and, in its discretion, may take or order the taking of additional testimony, and shall make its findings of fact and enter its award thereon." Respondents contend that the omission of the italicized portion of section 4471, supra, when that section was amended in 1931, indicates the intention of the legislature to prevent the commission from making findings and an award contrary to the award made by the summary order of the referee, without taking additional testimony. In our opinion the omission of such words in the amendment does not deprive the commission of that power. The statute, as amended, provides for a review by the commission of the order entered by its referee and makes it the duty of the commission to review the entire record in the case. After reviewing the record the statute leaves it to the discretion of the commission as to whether it will take or order the taking of additional testimony. This matter being discretionary, it follows that additional testimony may or may not be taken. The remaining portion of the statute provides that the commission *shall* make its findings of fact and enter its award thereon. Where there is an appeal from the referee's order, the making of findings and an award thereon is obligatory on the commission. Otherwise such an appeal would be but an idle gesture. If the taking of additional testimony is discretionary, then such findings and award of necessity will be based on the record, if the commission exercises its discretion and does not take any additional testimony. In brief, if the commission must make an award under such circumstances, and cannot do so on the record, but must take additional testimony, then the taking of additional testimony is not discretionary, a conclusion that would make the two provisions of the statute inconsistent with each other. That the legislature intended the commission should be a fact finding body whose conclusions on disputed testimony should be binding on the courts of review is apparent from section 4477,

C. L. 1921, which sets forth the only three grounds upon which awards may be set aside by the district court, namely: "(a) That the commission acted without or in excess of its powers; (b) That the finding, order or award was procured by fraud; (c) That the findings of fact by the commission do not support the order or award."

■■■ The cause comes to this court on writ of error and we can review only what the district court had a right to determine. What constitutes evidence is a question of law. Under the act, the district court therefore, and on review, this court, may examine the record to determine whether or not there is anything therein constituting evidence to support the findings of the commission. If there is no evidence in support of the propositions that must be established by a party in order to prevail, then the commission acted in excess of its powers in finding for such party, for the commission is authorized under the law to make an award of compensation only where the necessary prerequisites are established by evidence. From the statutory limitations as to the grounds on which the courts may review the commission's award, it is apparent that even in a case where the commission has never seen the witnesses, it was the legislative intent that the commission's findings of fact nevertheless should be binding on the district court and, therefore, binding on this court. While apparently the question has not heretofore been raised in the precise form in which it arises in this case, a long line of decisions of this court holds that the commission is a fact finding body and that its findings are binding on this court. *Passini v. Industrial Commission,* 64 Colo. 349, 171 Pac. 369; *Weaver v. Industrial Commission,* 72 Colo. 79, 209 Pac. 642; *Rogers v. Industrial Commission,* 94 Colo. 56, 28 P. (2d) 343; *Empire Zinc Co. v. Industrial Commission,* 94 Colo. 98, 28 P. (2d) 337; *Poole v. Industrial Commission,* 94 Colo. 163, 28 P. (2d) 809; *Hayden Brothers v. Industrial Commission,* 94 Colo. 211, 29 P.

(2d) 637; *Central Surety Co. v. Industrial Commission,* 94 Colo. 341, 30 P. (2d) 253; *Boulder Valley Coal Co. v. Shipka,* 94 Colo. 394, 30 P. (2d) 852; *Jabot v. Industrial Commission,* 94 Colo. 424, 30 P. (2d) 871; *Card Iron Works v. Radovich,* 94 Colo. 426, 30 P. (2d) 1108; *Allen v. Gettler,* 94 Colo. 528, 30 P. (2d) 1117.

Having disposed of the first contention of the respondents, it remains only to determine whether there is evidence to support the commission's findings.

 There are three questions involved in every workmen's compensation case: (a) Was the death due to an accident? (b) Did the accident occur in the course of the employment? (c) Did the accident arise out of the employment? If there is evidence in the record supporting an affirmative answer to these three questions, then there is evidence to support the commission's findings.

Deceased was employed by defendant bank as a watchman in a large office building. A number of negro janitors were employed in the building. Deceased was the head watchman with no authority to supervise the work of the janitors, but he did have authority and it was his duty to see that all employees were out of the building within a reasonable time after their work was completed; to stop any disturbance or disorder that might arise among the employees or others who might be in the building; and to put out of the building employees or other persons who might be creating a disturbance. As to the ordinary work about the building, the janitors were in charge after five o'clock, but if anything out of the ordinary arose requiring action, the deceased was in charge. In the words of Mr. Roberts, the assistant cashier of defendant bank, deceased was "responsible for the entire interior of the bank, to see that those reporting out at five o'clock did so in the usual way, giving him the time they were going out; to see that all the doors were locked, to see that reports were made regularly to the A. D. T. and maintain order, and see that nothing unusual transpired in the bank."

Between five and six o'clock one of the negro porters, Jacqueline by name, left the building and bought some tobacco, a pint of whiskey and a pint of gin, returning to the building after being absent about ten minutes. Before Jacqueline left the bank he took at least two drinks, and by his own testimony whatever drinks he took consumed practically a half of one of the pints, whether the bottle of gin or the bottle of whiskey does not appear. About 7:30, and after his work was completed, Jacqueline came up from the basement. He was very talkative, and while he himself denies it, there is testimony from which it might be concluded that he left the building and was gone about ten minutes before returning. Mrs. Scott, the elevator pilot, noticed that he had been drinking. Another witness testified that when Jacqueline came back through the side entrance it seemed as though he were moving himself alongside the wall with one hand, and this witness said that he thought to himself: "That fellow has a nice jag." There is ample evidence to sustain the finding that Jacqueline was in an intoxicated condition.

It is further disclosed by the evidence that Yuenger said to Jacqueline, "You are not going to drive that car to Englewood are you?" And that Jacqueline replied: "That is just what I am going to do, and furthermore, don't you ever say I was down there [referring to the basement] asleep." There was some argument between Yuenger and Jacqueline as to whether Jacqueline had been asleep or not. While the evidence is conflicting as to whether, following this altercation, Jacqueline first struck deceased or deceased first kicked Jacqueline, there is evidence, which, if believed by the commission—as we must assume it was—justifies the finding that Jacqueline first struck deceased. It appears from the record that when Yuenger was struck he became violently enraged and began kicking at Jacqueline. Another negro janitor then took hold of Jacqueline and pushed him toward the door during which time Yuenger got his gun from the

desk. This he was prevented from using by another employee who held his arm until Jacqueline was outside. Later deceased's glasses were picked up from the floor and various buttons were found which tends to show that the scuffle was rather a strenuous one. Almost as soon as Jacqueline had gone out through the door Yuenger fell to the floor dead.

The autopsy findings show that deceased was suffering from advanced athero-sclerosis of both coronary arteries, which are the arteries supplying blood to the heart muscle itself, and from chronic fibrous myocarditis. Both coronary arteries were nearly closed.

The medical testimony was to the effect that where a person has a heart condition, such as was disclosed by the autopsy finding in this case, ''anything such as anger or emotion which increases the heart rate, increases the demand on the blood supply from the heart and produces sudden death under these physical conditions.'' That any exercise, such as ''running upstairs, lifting heavy objects, running after a street car, in fact any emotion or anger, fighting, and so forth,'' might have caused death; also, that deceased probably would not have died at the time he did, but for the excitement that occurred; that both physical exertion and mental excitement put an extra strain on the heart which might result in the very thing that happened in this case; that to cause death in such a case it is usually necessary that some sort of aggravation occur, something to put more than an ordinary strain on the heart; that it need not be very much, a very slight strain may be sufficient to cause death. One of the doctors, when asked whether he had formed an opinion as to what if anything accelerated Mr. Yuenger's death, replied: ''Principally the emotion, the exertion, superimposed upon an old heart condition.'' Again he stated: ''Sudden heart failure was possible any moment given two conditions, first, an excessive strain, and, second, an emotion; probably with emotion as the most important,'' and ''If there had been no sudden exertion

or psychic stimulation, he might have been able to survive five or ten years.'' Another doctor stated that ''he could have died sitting in a chair without any exertion,'' but when asked what effect strain or exertion has in a case of this kind, replied: ''It might be an over-stimulation of the heart and cause sudden death,'' and in cases like this that it ''may accelerate the danger.'' A third doctor testified that excitement, strain and exertion might bring about death to one suffering from chronic heart trouble such as that from which Yuenger was suffering. Another doctor testified that a spasm of the heart muscle might be produced by emotion, exertion or strain, and that such a spasm might close the coronary arteries in a case where there was present a condition such as here existed, and cause death.

We think the foregoing medical testimony was sufficient to sustain the finding of the commission that the decedent, considering his condition, so overexerted himself that his death, which followed immediately thereafter, was directly and proximately caused by such overexertion. The exertion, as one doctor stated, would not have killed a normal individual, but deceased did not have normal resistance. The defendant bank had Yuenger in its service with *his* resistance to exertion and other forms of accident, not an individual with a resistance to exertion and other forms of accident denominated as a normal resistance. The important question here is, whether what occurred was overexertion for *him* and whether such overexertion proximately caused *his* death. The commission so found.

Can the occurrence—in view of the attending circumstances—which culminated in Yuenger's death, be classed as an accident as that word is used in the Workmen's Compensation Act? We have determined in this state that an accident is a result, the causes of which are unexpected and unusual or that it may be also an unexpected and unusual result from ordinary causes. In *Carroll v. Industrial Commission*, 69 Colo. 473, 195 Pac.

1097, we said: "Our statute uses the expressions 'personal injury or death accidentally sustained,' and 'injury proximately caused by accident,' in providing for what injuries or deaths compensation shall be allowed. By the term 'injury' is meant, not only an injury the means or cause of which is an accident, but also any injury which is itself an accident. The expressions above quoted are the equivalent of 'injury by accident,' which is frequently used in the decisions. The word 'by' may mean 'through the means, act, or instrumentality of.' 9 C. J. 1109. Therefore 'injury by accident' and 'injury caused by accident' are terms or expressions which can be used interchangeably. In a discussion of the former, it is said in 25 Harvard Law Review, 340:

" 'Since the case of Fenton v. Thorley, nothing more is required than that the harm that the plaintiff has sustained shall be unexpected. * * * It is enough that the causes, themselves known and usual, should produce a result which on a particular occasion is neither designed nor expected. The test as to whether an injury is unexpected and so if received on a single occasion occurs 'by accident' is that the sufferer did not intend or expect that injury would on that particular occasion result from what he was doing.' " *Ellerman v. The Industrial Commission,* 73 Colo. 20, 213 Pac. 120; *Allen v. Gettler,* 94 Colo. 528, 30 P. (2d) 1117. If the causes shown by the evidence, exertion and excitement, were not out of the ordinary, the result was out of the ordinary and was unexpected and under rules we have laid down constituted an accident.

■ Did the accident occur in the course of employment and arise out of it? If some third party, for example another of the janitors, had been slapped by Jacqueline, and a scuffle had ensued between Jacqueline and the watchman while the latter was attempting to eject him from the building, there could be little question but that such an act of the watchman was within the scope of his employment, and if he had overexerted him-

self in ejecting the man, with the result which followed in this case, there could be no question but that the overexertion constituting an accident was within the scope of his employment. We can see no distinction between the assumed case and the one here under consideration where Jacqueline chose to start the disturbance by slapping the watchman himself. It constituted a disorder or disturbance the quieting of which was within the scope of the duties of the watchman. In other words, what occurred arose out of and in the course of deceased's employment.

We therefore hold that the evidence is sufficient to support the finding of the commission that the deceased came to his death from overexertion; that the overexertion was the proximate cause of death, and that under the facts disclosed by the record it constituted an accident arising out of and in the course of his employment.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE BUTLER and MR. JUSTICE BURKE concur.