No. 14,661.

STATE COMPENSATION INSURANCE FUND ET AL. *v*. RUSSELL.
(96 P. [2d] 846)

Decided November 27, 1939.

Mr. BYRON G. ROGERS, Attorney General, Mr. FRANK A. BRUNO, Assistant, Mr. HAROLD CLARK THOMPSON, Mr. LOUIS SCHIFF, for plaintiffs in error.

Mr. GEORGE H. BLICKHAHN, for defendant in error.

*In Department.*

MR. JUSTICE BAKKE delivered the opinion of the court.

THIS is a workman's compensation action brought by the employee's widow, Minnie E. Russell, as claimant, for compensation on account of the accidental death of her husband, a deputy water commissioner in Huerfano county employed by the state. The Industrial Commission denied her claim, but the district court reversed the findings of the commission and remanded the cause with instructions to enter an award in favor of claimant. The State Compensation Insurance Fund, which was the insurance carrier, and the Industrial Commission seek reversal of the judgment of the trial court here and ask for a reinstatement of the commission's award denying the claim.

The finding and order of the commission, omitting the formal parts, was as follows:

"That the decedent herein was employed as a deputy water commissioner in water district #16. On October 20, 1938, after he had turned in his annual report (his active employment terminated upon that date), he drove to the home of his aunt in Walsenburg and parked his car. He was found lying beside the car shortly thereafter, shot through the head. The fatal injury was inflicted by a 22 caliber rifle, and the rifle was found lying in the car with the muzzle resting on the window. The decedent died without regaining consciousness.

"The testimony before the Commission indicates that the board of water commissioners does not require their deputies to carry fire arms in the course of their duties, but that where superiors had knowledge of such practice, no objection was raised. It is necessary from time to time for these deputy commissioners to make arrests in the course of their duties. In this particular case the

decedent carried the 22 rifle with him in the car regularly and made a practice of shooting rabbits and prairie dogs to provide food for his dogs. His average weekly wages were $30.00. He left surviving him and totally dependent upon him his widow, Minnie E. Russell.

"The Commission finds that the decedent did not carry the 22 rifle, by means of which he came to his death, for the purpose of assisting him in the performance of his official duties, but on the contrary, he carried the rifle as a sporting arm and used it primarily for his own convenience. The Commission, therefore finds that the decedent's accident and death did not arise either out of or in the course of his employment.

"It is therefore ordered: That the claim for compensation filed herein be and the same hereby is denied."

The only question before us is whether there was any competent testimony, or proper deductions or inferences therefrom, on which the above award denying compensation can be based. As noted in the commission's finding, deceased "did not carry the 22 rifle * * * for the purpose of assisting him in the performance of his official duties * * * but * * * as a sporting arm and used it primarily for his own convenience."

The testimony on this matter, as given by Mrs. Hill, decedent's aunt, at whose home in Walsenburg he had stopped, was as follows: "Q. Now isn't it true, Mrs. Hill, that it was Mr. Russell's custom to shoot rabbits and prairie dogs?  A. Yes, sir.  Q. For his own dogs, with that 22 rifle?  A. Yes, sir.  Q. And isn't it also true he carried a 38 revolver in the car?  A. I never seen one.  Q. If he did, you don't know about it?  A. No, sir.  Q. How many dogs did Mr. Russell have?  A. Two.  Q. What kind were they?  A. I guess one of them is a Rat Terrier and I guess the other one was just a dog.  Q. Did you ever see any rabbits or game in the car that Mr. Russell had shot?  A. Yes, sir, I have.  Q. What type of game have you seen there?  A. Rabbits and prairie dogs.  Q. How often did you see them

in the car? A. I couldn't say just how often, but I have seen them several times. I couldn't say just how often. Q. Do you know whether or not he fed those to this dogs? A. Yes, sir. Q. Did he? A. He certainly did."

Miss Stranger, clerk in the water commissioner's office in Walsenburg, was asked the question, "Did you know of his using this rifle to shoot rabbits and prairie dogs with?" and replied, "I knew he always carried it. I presumed that was what it was for."

Mrs. Russell, claimant, testified in part: "Yes, quite often if he had shot on the way—on his work, that is what I mean — on the prairie or any place where he might see a rabbit or a prairie dog, he would stand the gun, but quite often he had it laying down. * * *. Q. Mr. Russell used to get a hunting license every year, did he not? A. Yes, sir. Q. Do you know of his ever having used his 22 rifle for any purpose other than for shooting jack rabbits and prairie dogs for food for his dogs? A. I have never been present with him when he did. Q. Did he ever hunt for any other types of game? A. No."

Mr. Craig, decedent's superior officer, testified on this point: "Q. And he used that rifle to shoot rabbits for his dogs, ordinarily, did he not? A. I have an idea— he always carried a 22."

Was decedent's visit to his aunt's house made "in the course of his employment," or was it merely a social call? On this the commission found that the call was not made in the course of his employment. Regarding this phase of the case, the record shows that the accident occurred on the last day of his employment for the season; that he had just left his annual report at the water commissioner's office; that there were no telephone calls for him at his aunt's house; that he had nothing to deliver to her house; that he frequently took his meals with her when in town, and that on the day

of his death it was just a short time before the noon hour that he went there.

It thus appears that there was competent testimony before the commission from which proper deductions could be made and inferences drawn which support the finding that decedent's accidental death did not arise out of or in the course of his employment, one of the requisite conditions to the recovery of compensation under section 294, chapter 97, '35 C.S.A., C.L. §4389. The fact that there was some testimony indicating the contrary did not justify the trial court in setting aside the finding of the commission.

Claimant relies strongly on the case of *Comstock v. Bivens*, 78 Colo. 107, 239 Pac. 869, and that of *Security State Bank v. Propst*, 99 Colo. 67, 59 P. (2d) 798. However, it is to be borne in mind that in both of those cases the commission found for the claimant in the first instance, and the court observed in the Comstock case: "However that may be, as Comstock's death precludes any testimony from him as to his object, it was for the Industrial Commission, and not for the courts, to draw its own inference and the commission reached its conclusion that on this drive Comstock was engaged in serving his employers by putting away for the night the facility for performing the work which the contract required him to utilize."

In the Security bank case the finding of the commission in part was, "that the accidental shooting had nothing whatever to do with the fact that the decedent had stopped at the post-office. Apparently he was in the act of putting away his gun, an act which was performed at the end of the journey, and which might as well have been performed in the front of the post office as well as in front of the bank building," and in connection with that finding, we stated: "This finding is supported by reasonable inferences drawn from the record." In this same case the commission found that Propst had obtained a permit from the sheriff "to protect those sums

of money," and in the Comstock case, it was found that decedent was justified in arming himself to protect the United States mail.

In the instant case, it was possible to infer from the testimony that decedent was carrying the 22 rifle to protect himself, but it is in evidence that the usual arm for that purpose and the one carried by some of the other employees, was a 38 caliber revolver. However, it is just as reasonable to infer that since deceased had had no particular difficulty for several years which required the use of a fire arm for protection, he was carrying the rifle to shoot prairie dogs and rabbits.

In the recent case of *White v. Industrial Commission,* 104 Colo. 372, 90 P. (2d) 960, we held that a superintendent of a mining and milling company who was injured by the explosion of his own gun while hunting coyotes, in the circumstances presented, was not injured in an accident that arose out of or in the course of his employment, and, reaffirming our previous holdings, stated, that "Though all the evidence produced may come from the claimant, and viewed in its most favorable light, support an award for him, if it justifies adverse inferences, which the commission clearly draws, a contrary award will be upheld." Also see *Industrial Commission v. Valdez,* 101 Colo. 482, 74 P. (2d) 710, cited in the White case, and *American M. Co. v. Zupet,* 101 Colo. 238, 72 P. (2d) 281.

The judgment is reversed, and the cause remanded with instructions to reinstate the award of the commission denying the claim.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE BURKE concur.