No. 16,190.

ZUZICH *v.* LEYDEN LIGNITE COMPANY ET AL.
(206 P. [2d] 833)

Decided May 2, 1949.  Rehearing denied May 23, 1949.

Mr. L. F. BUTLER, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH E. NEWMAN, Acting Deputy, Mr. DONALD McKINLAY, Assistant, for defendant in error Industrial Commission.

Mr. FORREST C. NORTHCUTT, for defendants in error Leyden Lignite Company and Employers' Mutual Insurance Company.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

In a workmen's compensation case, Frances Tegel Zuzich, to whom we hereinafter refer as claimant, asserted that compensation was due her under "Workmen's Compensation Act of Colorado" as the common-law widow and dependent of Mike Zuzich, who died as a result of injuries proximately caused by an accident arising out of and in the course of his employment.

The Leyden Lignite Company, a corporation, was the employer and will be herein designated as the Company; the Employers' Mutual Insurance Company, a corporation, will be called the Insurance Carrier, and the Industrial Commission of Colorado will be mentioned as the Commission.

Mike Zuzich died on August 14, 1944, and the first hearing before a Referee of the Commission was held on December 22, 1944, where it was admitted by the attorney for claimant, as well as by those representing the Company, Insurance Carrier and Commission, that the only issue for determination was the question of dependency. At the conclusion of this hearing, and thereafter on January 9, 1945, the Referee made a supplemental order in which he found "that claimant was not the common-law wife of the deceased and was not a dependent of the deceased," and therefore denied her right to compensation. On February 2, 1945, claimant petitioned for review of the Referee's order, and on March 1, 1945, the Commission entered its findings of fact and award, affirming, approving and adopting the supplemental order of the Referee. Thereafter, and on March 29, 1945, claimant petitioned for a review of the Commission's findings of fact and award, and on April 5, 1945, the Commission entered its supplemental award in which its findings of fact and award of March 1, 1945, were affirmed, approved and adopted as the final award of the Commission. Thereafter an action was commenced in the district court of the second judicial district to modify and vacate the supplemental award of the Commission, and on October 15, 1947, said court

ordered the cause remanded to the Commission with instructions: 1. To hear and determine whether the claimant and the deceased entered into an agreement of marriage; 2. to specifically find whether there had been cohabitation; and 3. to specifically find concerning the repute of the parties as to their marriageable status. Thereafter, pursuant to these instructions, and on December 5, 1947, a hearing was had before a Referee other than the one who presided at the first hearing, at the conclusion of which, and on December 26, 1947, the Referee made and entered a supplemental order in which he found that in March, 1942, the decedent and claimant were qualified to intermarry; that they entered into a mutual agreement that thenceforth they would be husband and wife to each other, and that thereafter and until the date of decedent's passing, claimant and decedent lived and cohabited openly and notoriously as husband and wife; also, that: "From and after the time of the making of the said agreement, their reputation in the neighborhoods in which they resided as to whether they were husband and wife was not uniform, and the evidence does not establish the fact that their reputation that they were married was general. The said claimant at the time of the death was his wife and wholly dependent upon him. He left no other dependents surviving him."

The Referee concluded his supplemental order by allowing claimant death benefits in the aggregate sum of $4,375.00 payable in monthly installments of $60.79 each. Thereafter and on January 8, 1948, the Company and Insurance Carrier petitioned for a review of the order awarding claimant compensation, and on January 30, 1948, the Commission entered its supplemental award in which it found:

"* * * In March 1942 both the decedent and claimant, Frances Tegel Zuzich, were qualified to intermarry. From and after that time and until the time of the death of the decedent, he and the claimant, Frances Tegel

Zuzich, lived together and cohabited openly and notoriously. They had not entered into a mutual agreement of marriage. During the time of their said cohabitation, their general repute in the neighborhoods in which they resided was not that they were husband and wife. Therefore, at the time of his death, the decedent, Mike Zuzich, and the claimant, Frances Tegel Zuzich, were not mutually husband and wife. The said decedent left surviving him no person or persons either wholly or partially dependent upon him.

"It is, therefore, ordered: That the Supplemental Order of the Referee of this Commission dated December 26, 1947 be and the same is hereby vacated, set aside and held for naught and this Order substituted therefor.

"It is further ordered: That the claim for the claimant, Frances Tegel Zuzich, for death benefits on account of the death of the said Mike Zuzich, be and the same is hereby denied."

Thereafter and on February 25, 1948, an action was commenced in the district court to set aside the findings and award of the Commission, and on December 20, 1948, the district court made its findings in favor of the Company, Insurance Carrier and Commission and entered judgment accordingly.

The specifications of points are five in number and are presented here under two general classifications: 1. The claimant established a common-law marriage and dependency within the meaning of the Workmen's Compensation Act, and, being without substantial conflict, it became the duty of the court to determine that issue in favor of claimant as a matter of law; 2. the findings of fact by the Commission on the controlling element of the issue, to wit: a contract or agreement of marriage, are contrary to the evidence and insufficient in law to support or sustain the conclusion of the Commission. We shall consider these specifications of points as they are classified and here presented.

It will be noted that at the first hearing before the Referee, his findings were adverse to claimant and were approved by the Commission. At the second hearing the Referee's findings were favorable to claimant, and the Commission set aside his findings and entered its supplemental award adverse to claimant. This latter supplemental award was upheld and affirmed by the district court. It therefore becomes our duty to examine the evidence introduced in the two hearings before the Referees in order to determine whether the record contains sufficient competent and relevant evidence, even though a conflict existed therein, to support the Commission's supplemental award and judgment of the district court.

The record discloses that Mike Zuzich was an employee of the Company and died on August 14, 1944, as a result of injuries sustained in an accident arising out of and in the course of his employment, and that claimant contended, as we have stated, that she was his common-law widow and a dependent, and as such was entitled to workmen's compensation under the provisions of the "Workmen's Compensation Act of Colorado."

Claimant was foreign born and apparently had some difficulty in expressing herself in the English language. She testified that she was widowed by the death of her first husband, whose name was Tegel, and that some time thereafter, and in March, 1942, she and Zuzich, with whom she had been acquainted for about ten years, "decided to get married," and thereafter "we just stayed together like a married couple, I was his wife." That prior to March, 1942, and for a period of several years, Zuzich had been a boarder and roomer at claimant's house. She further testified that subsequent to March, 1942, they cohabited as man and wife; also that in 1944 they moved to Denver, where they lived at the time of Zuzich's death. She testified that subsequent to their marriage they had a grocery account under the name

of Zuzich, but we do not find in the record any corroborative evidence thereof, and it further appears that all the other family expenses were paid in cash. Claimant and Zuzich did not associate with neighbors and friends to any great extent, and while she testified that Zuzich introduced her as his wife, she was unable to recall the persons to whom such introductions were made. On cross-examination she stated that some people addressed her as Mrs. Zuzich while others spoke to her as Mrs. Tegel; that most of her friends knew her as Mrs. Tegel and that very few of the latter saw her with Zuzich after 1942. Her telephone was listed under the name of Tegel; her monthly statements were rendered under that appellation, and Zuzich's name was not listed in the telephone directory. She further testified that in the 1942 city directory her name appeared as "Frances Tegel, widow, John." Claimant and decedent were Catholics, and she testified that both she and Zuzich did not consider themselves married unless the ceremony was performed by a priest; that they both planned to go to church for a ceremonial marriage, but neglected to do so. When claimant was asked by the superintendent of the Company, after Mike's death, as to his relatives, she replied that his only relative was a brother residing in Pennsylvania, from whom Zuzich had not heard for a long time, and she admitted that she did not tell the superintendent that she was Zuzich's wife. After Zuzich's burial claimant received his personal effects, and at that time had a conversation with the embalmer, who also was deputy coroner of Jefferson county, in which she stated that Mike wasn't married, and in reply to a question as to whether he was married, she stated, "Not through church, no." And answering the question, "Now, didn't you say to him [embalmer] that it was too bad about Mike's death, that you were going to marry him?" she stated, "Well, I meant through the church." She was asked, "Didn't you tell him [embalmer] that you and Mike hadn't been

married?" and she replied, "I don't remember if I do or not."

On redirect examination claimant testified that the information furnished for the 1942 city directory, and the listing in the telephone directory was given by her daughter.

A welfare worker in Jefferson county testified that she had known claimant for about fifteen years; that part of that time she was her neighbor, and that she knew her as Mrs. Zuzich. She was asked if she was familiar with the relationship between Zuzich and claimant and responded that to the best of her knowledge they were married and known as husband and wife; that that was their general reputation in the neighborhood; and that her knowledge as to their marriage was obtained from claimant. In business transactions with witness, purchases were made by Zuzich subject to the approval of claimant, and purchases by claimant were made subject to the approval of Zuzich. The witness further testified that, so far as she could remember, claimant never referred to Zuzich as her husband while he was present, nor did Zuzich ever refer to claimant as his wife in the latter's presence; that on one occasion she had received a package addressed to Mrs. Mike Zuzich which she had delivered to her, and she stated that claimant was her close personal friend; further, that claimant and Zuzich made one social call on her and that she and her husband had made social calls at claimant's home in Jefferson county on one or two occasions.

The embalmer, who, as heretofore mentioned, was also deputy coroner of Jefferson county, was called as a witness and testified that on two occasions after Zuzich's death he had talked with claimant, first, in the office in Golden; that he was endeavoring to learn who were Zuzich's relatives, and that in response to his inquiry, claimant stated that Zuzich's only relative was a brother, whose address she did not know. On the

second visit claimant came to get Zuzich's personal effects, and at that time, in his conversation with her, he said: "She told me how badly she felt about Mike Zuzich, and how sincerely she regretted not having married him, as he had often asked her to, and that she was unable really to give a real reason why she didn't, and couldn't understand why she hadn't gone ahead and married him." At that time, when it became necessary to have her sign the "Certificate of Person Authorizing Burial," she signed her name as Frances Tegel, in which statement Mike Zuzich was listed as single, and deceased's residence was therein stated to be 3716 Perry St., Denver, Colorado.

A photostatic copy of the "Standard Certificate of Death," required by the Bureau of Vital Statistics, recites that Zuzich was "Single," and in section 16 (a) thereof appears: "Informant's own signature Mrs. Frances Tatgle."

A photostatic copy of the "Employee's Withholding Exemption Certificate," dated "6-25-43," and admittedly signed by Zuzich, discloses that he was an employee of the Company, and when required to designate his marital or other status for the purpose of having his employer withhold taxes due the United States Government, he therein described his status, "Single person (not head of a family) or married person not living with husband or wife (not head of a family) (3) * * *."

In the report of the fatal accident pertaining to Mike Zuzich, on file with the Chief Inspector of Coal Mines, there is contained a statement that the deceased was "Single" and had no dependents.

The first report of the accident required to be filed with the Commission discloses that decedent was a "timberman, age 53 years, and unmarried." This report was made by one Hugh James, who was mine clerk for the Company, and it was executed in the name of the Company.

In a supplemental report of the accident required by

the Commission, the Company was required to answer the following question: "If deceased left a wife, children or other person dependent upon him for support, give name, relationship, age and address of each dependent." No one was designated as widow, child or dependent.

In the "Proof of Death from Undertaker" there appears the sworn statement that "Mary Tegel" was the person who authorized the Boulevard Mortuary Association to incur the expenses relative to decedent's burial, and among the charges so authorized was "One Limousine for family for rosary" which is generally understood to be one of the rites of the Catholic church when one of that religious faith passes away.

As we have said, at the conclusion of the first hearing the Referee found, and the Commission affirmed, approved and adopted the supplemental finding and order of the Referee to the effect that claimant was not the common-law wife of the deceased. The Commission's first supplemental award was, as we have said, remanded by the district court to the Commission with instructions to determine whether claimant and decedent entered into an agreement of marriage, and specifically whether they had cohabited, and what was their reputation as to marital status.

At the second hearing a witness who had resided near claimant in Leyden was called, and testified that she knew decedent while he was a boarder at claimant's house, and that she became acquainted with her in 1933. She further testified that she, decedent, and claimant were Slovanians and belonged to a Slovanian society; that at a meeting of this society decedent told everyone that he was married to claimant, and that those present then drank to his marriage and congratulated and "kidded" him. She also testified that the general reputation in the community in which claimant and decedent lived was that they were husband and wife, but that claimant used the name Tegel, as well as Zuzich, after the marriage; that she was on friendly

social terms with claimant and decedent and that decedent usually referred to claimant as "Frances" or "the lady" or the "old lady," and at times as his wife. This witness further stated that the general reputation of claimant and decedent as to their marital status in Denver was husband and wife, but that she had never discussed the matter with anyone in Denver.

Another witness testified that he had worked with decedent in the coal mining business continuously from 1934 to 1942; that decedent had advised him of his contemplated marriage to claimant, and that later he had advised him that he was married and enjoyed his married life.

Claimant was recalled as a witness and reiterated the testimony heretofore noted as given by her, and in addition thereto admitted that most of the time after her marriage she used the name Tegel; that most people who knew her real well called her Zuzich while others called her Tegel. She also admitted that when asked by the deputy coroner as to decedent's relatives she replied that his only relative was a brother; that she did not consider herself a relative because she was not a blood relative. Concerning the contemplated church ceremony about which she testified at the first hearing, she said, "I just think maybe we go sometime and go married in church beside the marriage we make. But we have never been very much interested to do that." With reference to the withholding exemption certificate hereinbefore mentioned, dated June 25, 1943, claimant testified that she knew decedent had stated that he was single, but he admitted that he had made a mistake and would correct the same, but according to the record that mistake, if it was such, never was corrected.

In answer to the question, "Did you and he [decedent] ever say that you would go to church and be married?" she answered, "Well, we been married already, but we just think to get married again some place. Why we think that I don't know. I don't know it is allowed to

use the name Zuzich if we are not married in the church. I don't know that. That is the reason why I use most of the places Tegel." She further testified that the common-law marriage agreement to which she testified was made with decedent "upstairs in the sleepingroom." Claimant admitted that she registered as an elector under the name of Frances Tegel on August 24, 1944, ten days after decedent's passing, and voted under that name in 1944. She could not remember whether she signed the "Dependent's Notice and Claim for Compensation" under the name of Tegal or Zuzich.

Election officers testified to claimant's registration and voting under the name of Frances Tegel and that claimant was known in her voting precinct as Mrs. Frances Tegel.

Claimant, again recalled as a witness, testified that one of the election officials expressed sympathy after the death of Zuzich, using the expression, "I am sorry you lose your husband," but this was directly and specifically denied by the witness, who testified that she lived directly across the street from claimant's house in Denver; that she had seen a man coming from work and sitting on the porch; that she did not know that he was a boarder at claimant's house, but assumed that he was a friend of claimant's, and that was the only way she knew the man. She further testified that after decedent's death claimant stated to her that she was sorry that she hadn't married decedent.

■ We have held uniformly that findings of the Industrial Commission as to facts must be accepted by the courts if there is any substantial evidence to support them. *United States Fidelity & Guaranty Company v. Industrial Commission*, 96 Colo. 571, 45 P. (2d) 895; *American Mining Co. v. Zupet*, 101 Colo. 238, 72 P. (2d) 281; *Industrial Commission v. Valdez*, 101 Colo. 482, 74 P. (2d) 710; *White v. Industrial Commission*, 104 Colo. 372, 90 P. (2d) 960; *State Compensation Insurance Fund v. Russell*, 105 Colo. 274, 96 P. (2d) 846; *Moffat Coal Co.*

*v. Industrial Commission,* 108 Colo. 388, 118 P. (2d) 769; *Rocky Mountain Fuel Co. v. Reed,* 110 Colo. 88, 130 P. (2d) 1049; *Warner v. Mullens,* 111 Colo. 60, 137 P. (2d) 420; *Carbone & Company v. MacGregor,* 113 Colo. 241, 155 P. (2d) 994; *Morrison v. Clayton Coal Co.,* 116 Colo. 501, 181 P. (2d) 1011; *Ohio Casualty Insurance Co. v. Industrial Commission,* 117 Colo. 451, 189 P. (2d) 453; *Southern Colorado Power Co. v. Industrial Commission,* 118 Colo. 186, 193 P. (2d) 885.

In *American Mining Co. v. Zupet, supra,* Mr. Justice Holland, writing the opinion of the court, stated:

"The trial court, at considerable length in a written opinion, reviewed the evidence, commented upon the exhibits and nature of the testimony, and elaborately expressed its views as to the nature of the testimony and evidence. It made no finding of any error or mistake on the part of the commission or in the record, *but flatly disagreed with the commission's findings as to the effect of the evidence before that body, and substituted its own finding for the commission's finding and award.* On this review no other question is presented.

\* \* \*

"The matter of determining the probative effect of evidence in such cases, where there is a conflict, still remains *exclusively* with the commission where there is evidence for its consideration or from which it could draw a *reasonable inference.* In numerous cases we have said that the Workmen's Compensation Act *precludes* courts from passing upon the evidence in such cases and we have refused to change awards of the commission which were supported by the evidence, even though we, like the district court in this case, may have reached a conclusion differing from that of the fact-finding body." (Italics ours)

In *Moffat Coal Co. v. Industrial Commission, supra,* we said: "In their arguments counsel for plaintiffs in error inferentially concede that there is evidence in the record from which the habit and repute of marriage

may be inferred, but they assert that such evidence is rendered legally irrelevant by the affirmative testimony of the claimant hereinabove mentioned. In our view the fallacy of the theory of counsel lies in this assumption; this for the reason that while habit and repute of marriage are not essential to the legality of the relationship, *evidence thereof is always competent and in itself properly may be the basis for inferring consent to a contract of marriage. Peters v. Peters,* 73 Colo. 271, 215 Pac. 128, 33 A.L.R. 24. To obliterate such evidence in the case at bar would be to destroy the perspective of the picture painted by the record. Thus, at the most, we are confronted with a situation where a portion of the testimony adduced was sufficient to support a finding of a consummated mutual agreement between the parties to take each other presently as husband and wife, and other of the evidence, by reason of claimed self-contradiction by the only witness testifying, was allegedly inconsistent with the first. *Obviously, in this view the problem presented was one pertaining to the credibility of the witness and the weight to be accorded her testimony, the resolution of which is reserved to the commission and peculiarly within its province."* (Italics ours)

In *Comstock v. Bivens,* 78 Colo. 107, 239 Pac. 869, we held that inferences and conclusions to be drawn from the evidence in workmen's compensation cases are exclusively for determination by the commission and not by the courts. This rule of law in industrial commission cases was expressly approved in *Industrial Commission v. Valdez, supra; White v. Industrial Commission, supra; Moffat Coal Co. v. Industrial Commission, supra; State Compensation Insurance Fund v. Russell, supra.*

An examination of decisions by this court, wherein the question for determination was dependency resulting from a common-law marriage and which the Commission found to exist, discloses that we have approved uniformly the commission's findings, even though, as

was said in our decisions, if we were the fact-finding body we might disagree with those findings. *Employer's Mutual Insurance Co. v. Morgulski,* 69 Colo. 223, 193 Pac. 725; *Clayton Coal Co. v. Industrial Commission,* 93 Colo. 145, 25 P. (2d) 175; *Moffat Coal Co. v. Industrial Commission, supra; Rocky Mountain Fuel Co. v. Reed, supra.*

We also have held that, considering the statutory limitations as to grounds on which a court may review the Commission's award, it is apparent that even in a case where the Commission has never seen the witnesses, it was the legislative intent that its findings of fact nevertheless should be binding on the district court and therefore binding on us. *United States Fidelity & Guaranty Co. v. Industrial Commission, supra.* "While apparently the question has not heretofore been raised in the precise form in which it arises in this case, a long line of decisions of this body holds that the commission is a fact finding body and that its findings are binding on this court. [citing numerous cases]." *United States Fidelity & Guaranty Co. v. Industrial Commission, supra.*

We have detailed the testimony of the various witnesses in the two hearings before the Referee and the action on the Referee's report by the Commission in order that it shall clearly appear that in this case there was a conflict in material and relevant evidence, and the inferences and conclusions to be drawn therefrom may differ . widely. It is true that claimant's testimony as to the contract of marriage made at the time and under the circumstances hereinbefore related was not specifically denied by any witness. No witnesses were present on the occasion, and death has foreclosed any opportunity of denial. It also is true that there was competent and relevant evidence, documentary in nature, from which the Commission might properly find that, notwithstanding claimant's testimony as to the contract of marriage, it was her intention, as well as

that of the decedent, to solemnize the event by a church ceremony, which admittedly was never done. Claimant's own testimony does establish that she and decedent did not enjoy a general reputation as husband and wife in the community in which they resided. We have repeatedly held that the credibility of witnesses, as well as the weight of the testimony, was peculiarly within the province of the Commission, and its determination, where conflict therein exists, is beyond the jurisdiction of courts to annul, modify or alter. Here there was competent and relevant evidence to support the Commission's findings, and, much as we sympathize with claimant's plight, under the law we are powerless to grant her relief.

The judgment is affirmed.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE HOLLAND dissent.